[Crim. No. 10010. Second Dist., Div. Two. May 20, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. PAUL WORTH SULLIVAN, Defendant and Appellant.

Mervyn L. Hecht, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Ernest S. Gould and Charles A. Collins, Deputy Attorneys General, for Plaintiff and Respondent.

FLEMING, J.—Defendant was found guilty of unlawful possession of heroin (Health & Saf. Code, § 11500). On appeal he contends the quantity of heroin seized was insufficient to sustain a conviction for possession of a narcotic.

On November 15, 1963, defendant had been arrested in a hotel lobby for being under the influence of narcotics. As the officers started to search defendant, he said he had a room in the hotel and would rather be searched there. The officers went with defendant to his room and, after searching him, started to search his room. Defendant said as long as they would find his outfit anyway, he would show them where it was, indicating the dresser. The officers searched the dresser and found a blue plastic case containing a syringe, an extra bulb, an extra syringe, a match cover folded over to protect the needle, a measuring spoon, and an ordinary kitchen spoon. There was cotton in the bottom of one of the spoons, and this cotton was still moist.

At the trial a police chemist testified there was a residue on the spoons and the residue contained heroin. The residue on the spoons was visible to the naked eye, he stated, but the heroin crystals themselves were detectable only through chemical testing and by microscopic observation. No analysis was made of the cotton.

We believe this case is similar to *People* v. *Aguilar*, 223 Cal. App.2d 119 [35 Cal.Rptr. 516], wherein the issue was stated: "Does the possession of two spoons, which are parts

of narcotic injection kits, from the scrapings of which a forensic chemist was able to detect a minuscule amount of heroin, constitute the known possession of the narcotic itself?'' In concluding that it did not, the court held that where a narcotic is imperceptible to the human eye and its presence can only be detected through chemical analysis, the evidence is insufficient to sustain a conviction for known possession of the narcotic. The court distinguished several cases which had held that the presence of a narcotic in a minute amount or in fragmentary form is sufficient to sustain a finding of known possession (*People* v. *Anderson,* 199 Cal.App.2d 510, 520 [18 Cal.Rptr. 793] ; *People* v. *Marich,* 201 Cal.App.2d 462 [19 Cal.Rptr. 909] ; *People* v. *Jones,* 113 Cal.App.2d 567 [248 P.2d 771] ; *People* v. *One 1959 Plymouth Sedan,* 186 Cal. App.2d 871 [9 Cal.Rptr. 104]), on the ground that the narcotic in those cases had been found in a recognizable state, while in the case before it the substance was in a different form. ''What remained in the bottom of the spoons was residue which was in a completely different form from that of heroin powder.'' (223 Cal.App.2d 122.)

Similarly in *People* v. *White,* 231 Cal.App.2d 82 [41 Cal. Rptr. 604], police officers in defendant's apartment observed fresh marks on defendant's arms, balloons on the dresser, two spoons containing a visible residue, several eyedroppers, and a hypodermic needle. The court, citing *Aguilar,* reversed a conviction for possession of heroin. See also *People* v. *Melendez,* 225 Cal.App.2d 67 [37 Cal.Rptr. 126] ; *People* v. *Cole,* 113 Cal.App.2d 253, 262 [248 P.2d 141] (suggesting that a minute quantity of marijuana would not constitute known possession of the narcotic).

We see no reason to distinguish this case from *Aguilar* and those decisions which have followed it. Here the traces of heroin on the spoon were not visible to the naked eye. The powder had been liquefied, and the residue which remained was different in form from the original substance. It seems evident that defendant was not aware of the heroin. He voluntarily invited the officers to his room; he offered to show them where his outfit was located; and when Officer Brown, upon finding the outfit, said, ''Mr. Sullivan, you have yourself a possession,'' defendant answered, ''Where? . . . I thought he was kidding, you know.'' ▆ As said in *Aguilar,* ''It is not scientific measurement and detection which is the ultimate test of the known possession of a narcotic, but rather the awareness of the defendant of the presence of the narcotic.

... The presence of the narcotic must be reflected in such form as reasonably imputes knowledge to the defendant.'' (Pp. 122-123.)

The Attorney General, however, contends a conviction was proper because defendant admitted using narcotics on the morning of his arrest and admitted permitting others to use his room to take a fix, and thus he knew or should have known that a residue of heroin would remain on the spoons. The logic of this contention would convert evidence of recent past possession of narcotics into proof of present possession of narcotics, a proposition which has been implicitly rejected in *Aguilar, supra,* and in *Melendez, supra.* Were we to accept evidence of recent past possession of narcotics as equivalent to proof of present possession of narcotics, then we could charge every addict who was currently hot with possession of a narcotic, since he must have had possession of the narcotic in the recent past in order to come under its influence.

While, concededly, there is an element of gamesmanship in securing proof of unlawful possession of narcotics, the criminal law is engaged in a continuous process of drawing lines, and in the enforcement of offenses involving possession of narcotics fixed lines appear to be unavoidable. (*People v. Cruz,* 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889].)

■ To this end we believe the Legislature has established helpful guidelines in distinguishing the crimes of possession of narcotics paraphernalia (Health & Saf. Code, § 11555) and of being under the influence of narcotics (Health & Saf. Code, § 11721), both misdemeanors, from the more serious crime of possessing the narcotic itself (Health & Saf. Code, § 11500), a felony. This distinction is pertinent to the present case where the evidence shows that defendant was in possession of a narcotics kit and was under the influence of narcotics; but does not support the charge that he knowingly possessed heroin.

■ We conclude that possession of a minute crystaline residue of narcotic not intended for consumption or sale and useless for either of these purposes is insufficient evidence to sustain a conviction for known possession of a narcotic.

Judgment reversed.

Roth, P. J., concurred.

HERNDON, J.—I concur in the judgment and, in major part, agree with the opinion of my colleagues. However, I

deem it appropriate to set forth the somewhat different process of reasoning which leads me to the same conclusion. In my opinion, the decision in *People* v. *Aguilar*, 223 Cal.App.2d 119 [35 Cal.Rptr. 516], and the later decisions in *People* v. *Melendez*, 225 Cal.App.2d 67 [37 Cal.Rptr. 126], and *People* v. *White*, 231 Cal.App.2d 82 [41 Cal.Rptr. 604], which cite and follow *Aguilar*, do not promulgate any radically novel rule of criminal law which would preclude successful prosecution of charges of possession of narcotics except in cases where the guilty possessor has been apprehended "flagrante delicto."

The vast majority of crimes are of such a nature that necessarily they will constitute "past" crimes in the sense that they were perpetrated some time before the perpetrator was apprehended, except in those rare and fortuitous instances in which the criminal is "caught in the act." Even in crimes, such as the instant one, involving "possession" of some specified contraband, in which the "act" of commission may extend over a considerable period of time, the governing rules are not different.

As stated in *People* v. *Belli*, 127 Cal.App. 269, 271 [15 P.2d 809]: "[I]n order to establish possession within the meaning of said act, it is necessary to prove that the possession was immediate and exclusive and under the dominion and control of the person charged with such possession. But nowhere do the terms of the act require, nor, so far as our attention has been called, do any of the decisions interpreting the act hold as appellant seems to contend, *that proof of possession at the very time of arrest is essential.*" (Italics added.)

Neither do I regard the Legislature's enactment of prohibitions against "being under the influence of narcotics" or in possession of "paraphernalia" (neither of which is a necessarily included lesser offense within the crime of possession of narcotics) as indicative of that body's intention to establish a different rule. They appear to me only to indicate the reasonable desire to "cover the field" in connection with this grievous social problem and a realistic recognition that problems of proof often prevent successful prosecution for the more serious, but related, offenses. Their true purpose, therefore, should not be thwarted by the enunciation of a rule which would prevent prosecution for the more serious offenses in cases where their commission can be proved beyond all reasonable doubt.

No reason for developing a different rule in regard to the crime of possessing heroin has been suggested and I do not read the *Aguilar* decision, or those which have followed it, as requiring the creation of such a novel concept. As I read these decisions, they amount to no more than a reasonable determination that where the prosecution is based solely upon the alleged possession of spoons (*Aguilar* and *White*) or a pipe (*Melendez*), which contain narcotic debris in altered form, such *debris* is not *itself* sufficient to sustain a conviction for *its* possession.

That is to say, if the *residual debris itself* is the contraband alleged to have been illegally possessed, then clearly no case has been established where the debris has been transformed into a different chemical state by reason of its past use, or where it is not visible to the naked eye, or where its nature is such that its true identity can be determined only by means of scientific chemical analysis. However, I do not believe that it follows that such residual debris, when combined with other evidence, cannot be used to establish the corpus delicti of the crime of possession of contraband in its "pure" state merely because the commission of such crime was effectuated by means of the contraband equipment.

Since no rule of law exists which requires that one must be caught in the act of committing a crime, and since the proof of the corpus delicti thereof need only be legally sufficient to satisfy the trier of fact that a crime has in fact been committed, I can see no reason why a trier of fact could not very properly conclude that heroin has recently been possessed by a person found under the influence of heroin and in possession of typical paraphernalia suited for the use of the drug and containing the residual and identifiable debris thereof and with cotton still moist therefrom.

The corpus delicti of possession having been established, a statement by the person admitting that he took a "fix" a few hours earlier would appear ample to support his conviction for that offense. The offense, of course, is the possession of heroin shortly before his apprehension, a fact which has been proved by circumstantial evidence sufficient to convince the trier of fact beyond all reasonable doubt, and not the offense of possessing the microscopically detectable debris that was found when the accused was arrested.

Certainly it was true prior to *Aguilar* that proof of the possession of heroin might be established by means other than the seizure and introduction into evidence of the contraband

itself. Thus, in *People* v. *Medina,* 198 Cal.App.2d 224 [17 Cal.Rptr. 722], a decision concurred in by Justice Burke, the author of *Aguilar,* a defendant was convicted of furnishing heroin to a minor "on or about September 25, 1959" although he was not taken into custody until September 7, 1960, and proof of the "past" crime consisted of the testimony of the minor concerning what had occurred on the earlier date. The court stated at page 231:

"A qualified expert witness stated, after hearing the testimony of the minor concerning the physical effects upon her of the substance administered to her by defendant that in his opinion the substance administered was heroin. The testimony produced and heard by the trier of fact was sufficient to sustain the conviction. (*People* v. *Rios,* 127 Cal.App.2d 620, 622 [274 P.2d 163].)"

Since the crime of furnishing heroin to a minor necessarily includes the lesser offense of possession of heroin, it appears clear to me that the court in rendering the *Aguilar* decision did not intend to establish a rule that would preclude convictions of "past" narcotic offenses of this kind or that would prohibit proof thereof by means other than the introduction of the contraband itself.

To my mind this is as it should be. Nearly everyone agrees, I think, that the traffic in narcotics constitutes one of our gravest social evils. As many lives are literally lost through its use in Los Angeles County annually as result from the crime of homicide. Certainly a great many more lives are effectively ruined thereby. In view of the tragically serious implications of such offenses as the one here in question, I cannot agree to the promulgation of a rule that would tend to treat the procedure for the control of this evil as a friendly game of "hide and seek" to be played between the police, the purveyors and the users of narcotics. Persons illegally using narcotics, of course, are emotionally "sick," at least, and they do what their sickness commands, not what we or they normally would do or tolerate. (Cf. *People* v. *Victor,* 62 Cal.2d 280, 301-304 [42 Cal.Rptr. 199, 398 P.2d 391].)

Whether the present participants in the narcotic traffic be treated as vicious criminals or as pathetically afflicted human beings caught in the grip of a progressive "disease," it must be agreed that they constitute effective "carriers" of a "contagious disease." Therefore, they must be confined and isolated for their own good as well as for the protection of our society, and their actions should not be lightly regarded.

Their protective isolation or treatment should not be hampered by artificial rules that never have been deemed applicable to other, and far less serious, offenses.

My feeling in this matter is particularly strong in cases such as the instant one involving a "possessor-user." In those instances, such as the present one where the "possessor-user" has been committed for treatment under the provisions of chapter 11, title 7, of part III of the Penal Code (§§ 6399-6521),[1] the duration of his custodial treatment will be the same whether he was initially convicted of a misdemeanor (§ 6450) or a felony (§ 6451), i.e., article 4, "Release in Outpatient Status," and article 5, "Discharge of Narcotic Addicts." It is only when the "possessor-user" fails to qualify for this treatment program (§§ 6450, 6451, 6452), or is returned to the committing court by reason of the fact that he has been found to be unfit for the program (§ 6453), that the severity of his crime will become pragmatically relevant.

It seems to me that it is not reasonable to hold, in effect, that the Legislature, by enacting section 11721 of the Health and Safety Code, has indicated an intent to impose no more than a misdemeanor sentence upon one who "because of excessive criminality or for other relevant reason" (§ 6453) is unfit for treatment even though his guilt of the crime of possession of heroin can be established under accepted rules of criminal law beyond any reasonable doubt. Certainly such intent is not apparent from the increasingly severe punishments enacted by the Legislature for criminal violations of the narcotics laws or by its expressed intent in enacting the treatment program. Section 6399 of the Penal Code expressly states:

"It is the intent of the Legislature that persons addicted to narcotics, or who by reason of repeated use of narcotics are in imminent danger of becoming addicted, shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict, or person in imminent danger of addiction, against himself, *but also for the prevention of contamination of others and the protection of the public.*" (Italics added.)

Can such an intent truly be served by the adoption of a

[1]The present appeal must be considered as taken from the order denying appellant's motion for a new trial since the record before us ends with all criminal proceedings suspended and appellant referred for examination under section 6451. (Pen. Code, § 1237.)

rule of law that would make persons who are found to be unfit for treatment subject only to a misdemeanor sentence unless "caught in the act" of committing the more serious crime whose commission has been adequately established?

Although in the instant case it would appear that appellant's commitment under the narcotic treatment program may not be affected by our reversal of this judgment and this by reason of the fact that he simultaneously pleaded guilty to the crime of burglary so that his reference for examination under section 6451 was made in connection with both offenses, in the usual case a reversal could create grave problems regarding the validity of the subsequent commitment for treatment that had followed upon conviction. (Cf. *People* v. *Victor, supra,* 62 Cal.2d 280, 295, discussing the requirement that "there must be shown express *authority* to file . . . a petition [for commitment]," and noting the "mutually exclusive" procedures provided by article 2, where the person to be committed has been convicted of a crime, and article 3, where no such conviction has occurred.)

However, I join in the reversal in the instant case because it is clear from the record that the case was not tried, nor was the conviction based, upon the theory that the prosecution had proved that appellant was in possession of heroin shortly before his arrest. As indicated, I believe the evidence presented is more than sufficient to sustain such a conviction. That is, any reasonable person would be convinced beyond all reasonable doubt that appellant had been guilty of violating section 11500 of the Health and Safety Code when he was found to be under the influence of narcotics, in possession of paraphernalia containing the identifiable remnants of heroin, and he admitted that he had taken an injection of heroin shortly before his arrest. This was the prosecution's case.

Appellant testified that he was *not* under the influence of narcotics when arrested, that the paraphernalia found in his room had been left there by another couple who had used it, that although he knew it was there he had never used it nor shared in the narcotics they had administered to themselves with it. In short, appellant admitted only that he knew he was in possession of a "used" narcotic kit but denied that he himself had ever possessed the narcotic which had been "used" therein. If this version was accepted as true by the trier of fact, then clearly appellant should not have been found guilty in the instant case.

That is to say, since according to his version, appellant

never exercised dominion or control over the heroin when it had been in its "pure" or "natural" state prior to the use of the paraphernalia, he was never guilty of possession of heroin initially. Certainly he could not subsequently become guilty of its possession by reason of the fact that the paraphernalia was left in his room after the heroin was "gone," i.e., after others had put the heroin to the use for which it was intended. Nevertheless, the trial court expressed its reasoning in this connection as follows:

"As the Court has stated, counsel, irrespective of the Aguilar case, this Court is satisfied that where there is cotton used, as there was in this case, and *whether it is used by the defendant or not,* is again, *in the Court's opinion, immaterial,* he knew that the *outfit* and the *cotton had been used* for an injection of heroin. He knew that *they* had been left in his *possession.* He knew or was charged with knowing that after such a use there will in all—unquestionably be in the cotton, at least, *debris,* heroin, and in all probability in the spoon itself where it had just been recently used, and he states it was used that same afternoon that he was arrested, so the Court is satisfied that he is chargeable with that knowledge." (Italics added.)

I therefore concur in the judgment of reversal.